IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RIVERBED TECHNOLOGY, INC.,  :
            Plaintiff,  :
            v.  :   C.A. No. 11-484-RGA
SILVER PEAK SYSTEMS, INC.,  :
            Defendant.  :

## CLAIM CONSTRUCTION OPINION

Thomas C. Grimm, Esq., Wilmington, Delaware; Matthew B. Lehr, Esq. (argued), Menlo Park, California; Attorneys for Plaintiff Riverbed Technology, Inc.

Richard L. Horwitz, Esq., Wilmington, Delaware; Michael J. Sacksteder, Esq. (argued), San Francisco, California; Attorneys for Defendant Silver Peak Systems, Inc.

July 13, 2013
Wilmington, Delaware

*/s/ Richard G. Andrews/*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This is a claim construction opinion. Defendant Silver Peak Systems, Inc. asserts United States Patent Nos. 7,945,736 B2 ("the '736 Patent"), 7,948,921 B1 ("the '921 Patent") and 7,630,295 B2 ("the '295 Patent") against Plaintiff Riverbed Technology, Inc.

A. '736 Patent

1. "configure(d)"

| Claim term | Silver Peak's Construction | Riverbed's Construction |
|---|---|---|
| "configure(d)"<br><br>'736 Patent, claims 1 and 2. | designed or programmed (with a capacity) to perform a function | set up to operate in a particular way |

The '736 Patent claims a system for managing network memory, allowing devices on the network to signal to other devices whether certain data is stored on faster or slower memory. This allows the system to determine whether it would be faster for a device to access data locally, if it is locally available on faster memory, or whether it would be faster to have that data resent over the network, if it is only locally available on slower memory. The first term is "configured," used as follows in claim 1:

> 1. A system for managing network memory, the system comprising:
>
> a first appliance in communication with a collocated computer and in communication with a second appliance via a wide area network, the second appliance including a faster memory and a slower memory;
>
> a communication interface included in the first appliance, the communication interface configured to receive a data packet from the computer and receive a status message from the second appliance, the status message indicating an activity level of the faster memory and the slower memory[.]

Silver Peak initially briefed that "configured" should be construed as "designed or programmed with a capacity to perform a function." At oral argument, Silver Peak volunteered

1

to leave out "with a capacity" from its construction, thus offering "designed or programmed to perform a function." For its part, Riverbed argues that "configured" should be construed as "set up to operate in a particular way." The dispute in scope is whether the system must perform the function it is "configured" to perform by default, i.e., "out-of-the-box," as argued by Riverbed, or whether the user may be required to take some step to enable that function, as argued by Silver Peak.[1] According to Silver Peak, so long as the system is designed to be capable of performing the function, the claim limitation is met.

The Court agrees with Silver Peak. If the system is expressly created so that the user may take advantage of a certain advantageous function, it is "configured" to perform that function. The Court sees no reason to exclude a system that requires the user to perform a very simple task, such as clicking a box, to enable the function. Even if the enablement of the function is not the default setting, the product is still configured to perform that function. Riverbed cites *Aspex Eyewear v. Marchon Eyewear* to argue that, as a matter of law, configured should not be construed as "capable of" or "designed to." 672 F.3d 1335 (Fed. Cir. 2007). Riverbed argues that because the Federal Circuit construed "adapted to" to mean "configured to," and rejected "capable of" as an incorrect and broader construction, *see id.* at 1349, it would be error to construe "configured to" as "capable of" here. The Court, however, is not convinced of *Aspex's* persuasive value here, as that case involved sunglasses technology, and this case involves networking systems. It is fair to say there is not much overlap between the two fields. In any event, the Federal Circuit also indicated that "configured to" and "designed to" could be

---

[1] Here, the function in question is "receive a data packet from the computer and receive a status message from the second appliance."

2

understood to be synonyms, which is consistent with Silver Peak's modified proposed construction. *See id.*

There is a more persuasive opinion in a case involving technology in the more related field of network optimization. In *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 831528, *11 (N.D. Cal. Jan. 10, 2013), Magistrate Judge Grewal of the Northern District of California construed "configured to" to include functions that require user activation. That Court noted that the Federal Circuit has held that "in an apparatus claim involving software, the infringement occurs because the software included the patented feature....the user's later choice about whether to use the infringing feature or not is irrelevant." *Id.* (citing *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002)). This Court agrees with the reasoning of *Brocade Communications*. "Configured" is construed as "designed or programmed to perform a function."

B. '921 Patent

1. "data packet"

| Claim term | Silver Peak's Construction | Riverbed's Construction |
|---|---|---|
| "data packet"<br><br>'921 Patent, claims 1, 14, 20 and 23. | basic unit of communication over a network comprising a header and a payload | a packet with both a header and a non-zero payload |

This brings the Court to the '921 Patent and the next term, which is "data packet." The '921 Patent provides a method for automatically optimizing the connection between devices by enabling an optimization device to indicate its presence to other devices on the network. "Data packets" are sent between computers with headers that may be modified by the optimization device so that other devices may recognize that a sending computer has enhanced processing

3

capabilities. If a "data packet" is received by another optimization device, the receiving device will respond with an indication of its own abilities, and the two devices can optimize the payloads of subsequent packets without prior manual configuration. "Data packet" is used in claim 1 as follows:

1. A method comprising:

    receiving a first data packet including an unenhanced payload from a first network device;

    modifying a portion of the first data packet, the portion being outside the unenhanced payload of the first data packet, to indicate that a first optimization device is capable of enhanced communication;

    sending the modified first data packet from the first optimization device to an endpoint device;

    receiving an indication of a capability of enhanced payload processing;

    generating an enhanced payload of a second data packet addressed to the endpoint device based on the indication;

    sending the second data packet including the enhanced payload to the endpoint device;

    sending a third data packet from the first optimization device to an endpoint device, the third data packet having a modified portion outside of a payload;

    receiving an acknowledgement of the third data packet that does not indicate a capability of enhanced payload processing;

    receiving a fourth data packet with an unenhanced payload; and

    sending the fourth data packet to the endpoint device.

The parties agree that a "data packet" includes a header and a payload. The dispute here is whether the "data packet" may include a payload with zero data content. Riverbed relies on a plain and ordinary interpretation of "data packet," arguing that the failure to require some data in the payload would fail to give meaning to "data" as it modifies "packet." Riverbed argues that Silver Peak's construction would wrongfully include non-data packets, such as SYN or ACT packets, which are used to set up a connection between two devices on a network, commonly

4

referred to as a "three way handshake." According to Riverbed, because those packets have no data, they are not "data packets." Silver Peak disagrees, arguing that while a data packet typically includes data, it need not always. In support of this argument, Silver Peak cites a portion of the specification:

> A data packet comprises a header and a payload. The header includes information such as source address, destination address, total length, type of service, and the like. The payload typically includes data to be processed by the receiving network device. An enhanced payload is a payload that has been modified such that it can be processed by another device capable of processing the enhanced payload.

'921 Patent at 3:30-36. According to Silver Peak, because a payload only "typically" includes data, the implication is that data is not always required.

The Court agrees with Silver Peak. There is nothing in the intrinsic evidence that strictly requires the presence of data in the payload for the detection of optimized devices. The patent requires headers, because that is the component of the packet modified to indicate optimization, but there is no payload data necessary for this to work. *See, e.g., id.* at 2:11-21. Riverbed argues that the patent extols the ability to modify headers without modifying the data of a payload, but it does not follow that all payloads must have data, even if this is a key purpose of the invention. Some embodiments certainly reference enhanced payloads, which implies the presence of data, but that does not mean that all payloads have data. Further, Riverbed's proposed "non-zero" language is nowhere to be found in the patent. Riverbed's sole intrinsic support is the fact that the patent claims "data packet," rather than "packet" alone, and thus supposedly some meaning must be ascribed to "data" as it modifies "packet." Although such a linguistic distinction has a certain appeal on the surface, especially to lawyers, Riverbed provided no evidence that someone skilled in the art differentiates between "data packets" and "packets" in general. Riverbed suggested that packets transmitted during the "three way handshake" should not be understood to

5

be "data packets." (D.I. 106, pp. 33-34). There is extrinsic evidence predating the filing of the '924 Patent application discussing the three way handshake, suggesting a SYN packet or an ACK packet would be understood to be a data packet.[2] For all of these reasons, the Court construes "data packet" as "basic unit of communication over a network comprising a header and a payload."

C. '295 Patent

1. "communications interface configured to process the signal to activate and deactivate the link"

| Claim term | Silver Peak's Construction | Riverbed's Construction |
|---|---|---|
| "communications interface configured to process the signal to activate and deactivate the link"<br><br>'295 Patent, claim 1 | a communications interface capable of processing a signal to enable and disable forwarding, passing through, or any other means of processing incoming data | a communications interface set up to process a signal to activate and deactivate the link |

The next term is "communications interface configured to process the signal to activate and deactivate the link." It appears in the following context of claim 1:

> ...the communications interface configured to process the signal to activate and deactivate the link to the policy based routing system, wherein the network device is detected as an open circuit by the policy based routing system when the link is deactivated such that data packets transferred between the wide area network and

---

[2] The web-site "Tech Republic" links to a 2001 article (Mullins, "Exploring the Anatomy of a Data Packet"), which describes the three way handshake within the context of "data packets" as follows:

> When the sending TCP host wants to establish connections, it sends a segment called a SYN to the peer TCP protocol running on the receiving host. The receiving TCP returns a segment called an ACK to acknowledge the successful receipt of the segment. The sending TCP sends another ACK segment and then proceeds to send the data. This exchange of control information is referred to as a *three-way handshake*.

Available at http://www.techrepublic.com/article/exploring-the-anatomy-of-a-data-packet/1041907 (last visited July 17, 2013).

6

the local area network are redirected away from the network device ensuring that data flow between the wide area network and the local area network is not disrupted during replacement and repair of the network device.

Riverbed offers essentially a plain language construction, aside from its inclusion of the already-rejected proposal for "configured." Silver Peak argues that its proposal is truer to the invention, as it emphasizes that the claim does not cover prior art "fail-to-wire" devices, which would allow traffic to continue to pass through a failed device. Instead, according to Silver Peak, the '295 Patent describes a device which is capable of essentially unplugging itself from the network such that a router connected to the network device will detect that the device is down, and the connection will be routed around that unplugged device.

The Court sees no reason to depart from the plain meaning of this phrase. "Process," "signal," "activate," and "deactivate" are not coined terms. Silver Peak does not argue that any word is specially defined or used in any manner inconsistent with how they would be understood by a person skilled in the art. Further, the claim language as a whole makes clear that the signal does not pass through a failed device, which is the function Silver Peak's construction seeks to avoid. The signal is instead "redirected away" from that device. *See id.* at claim 1. When there is no ambiguity as to whether the claim language overlaps with the distinguished prior art, there is no need to insert extraneous distinguishing language into the construction. For these reasons, the Court construes "communications interface configured to process the signal to activate and deactivate the link" according to its plain meaning.

D. Agreed-upon terms.

7

The parties briefed the remaining terms, but have since agreed as to their constructions. (D.I. 148). The first term is "status message" as used in the `736 Patent, which the parties agreed will be construed as "a message providing information regarding the relative activity of the faster memory and the slower memory on a second appliance." (*Id.* at 1). The second term is "out-of-path configuration" of the `295 Patent, which the parties agreed will be constructed as "a network configuration whereby the network device is not in the direct path between the LAN and the WAN." (*Id.* at 1-2).

The parties should submit a joint claim construction order suitable for submission to the jury within seven days of this opinion.

8